Robert F. Cunha – Massachusetts BBO No. 710882
MASSACHUSETTS DEFENDER LLC
90 Canal Street, 4th Floor
Boston, MA 02114
(617) 528-9855
bob@massdefender.com

ATTORNEY FOR PLAINTIFF

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEROME I. PLATT,<br><br>       Plaintiff,<br>    v.<br><br>CITY OF BOSTON, and Boston Police Department Officers PAULMICHAEL BERTOCCHI, KEVIN BUTCHER, SERGIO MEDRANO, KIRK MAXWELL, SEAN DOOLAN, SEAN MONAHAN, JOHN CANTY, CHRISTIAN CUASCUT HERNANDEZ, RICK JOHNSON, AND TIMOTHY CULLEN<br><br>       Defendants. | **Case No.: 1:23-cv-11315**<br><br>**COMPLAINT FOR DAMAGES AND VIOLATIONS OF CIVIL RIGHTS**<br><br>**DEMAND FOR JURY TRIAL** |

## PRELIMINARY STATEMENT

In the early morning hours of June 14, 2020, Jerome Platt was returning home from his own birthday party.  A friend drove while Mr. Platt slept in the passenger seat.  On Tremont Street in the South End, Boston Police Department (BPD) officers stopped the car for speeding; within minutes, BPD officers questioned Mr. Platt, ordered him to exit the vehicle, and patfrisked him.

Mr. Platt did not consent to a search.  Police officers did not possess a search warrant.  Moreover, officers did not have a reasonable, articulable suspicion that Mr. Platt was armed

and dangerous–which, under these circumstances, was the only constitutional grounds for conducting a patfrisk.

The officers' actions violated clearly established Fourth Amendment safeguards against unreasonable searches.  Officers also flouted the Equal Protection Clause of the Fourteenth Amendment because their actions were motivated, at least in part, by race.  Moreover, the unconstitutional search was part of BPD's custom and practice; the department had long known that officers routinely conducted wrongful patfrisks of Black citizens.  BPD officials likewise conceded that officer training and supervision were woefully inadequate.

Mr. Platt did not suffer serious physical injuries during the encounter–but he suffered. The patfrisk was humiliating, degrading, and physically painful.  And it was expensive: police officers confiscated nearly $1500 of Mr. Platt's money.

Most seriously, the patfrisk led directly to Mr. Platt's incarceration.  Although police officers did not find any weapons on Mr. Platt, they allegedly found illegal narcotics when they reached into his pockets.  Police charged Mr. Platt with two counts of Possession with Intent to Distribute Class B Substances (M.G.L. c. 94C, § 32A(a)).

Mr. Platt was held in lieu of bail on these charges for 328 days before this case was dismissed.  Although he is now free, the criminal charges are a permanent part of his record, visible to prospective employers, landlords, or licensing authorities.

Mr. Platt asks this Honorable Court for justice.

### JURISDICTION AND VENUE

1.      This Complaint seeks remedies pursuant under 42 U.S.C. § 1983.  The Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States, specifically the Fourth and Fourteenth Amendments.

2.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as the events giving rise to this action occurred within this District, and the Defendants are located within this jurisdiction.

## PARTIES

3.     The Plaintiff, Jerome I. Platt ("Mr. Platt" or "Plaintiff"), is an African-American citizen of the United States who, at all times relevant to this Complaint, resided in Boston, Massachusetts, in the County of Suffolk.

4.     Defendant City of Boston ("City") is a municipal corporation duly organized under the laws of the Commonwealth of Massachusetts and located in the County of Suffolk. The City operates the Boston Police Department ("BPD").  The City is sued under the doctrine of municipal liability.

5.     Defendants Paulmichael Bertocchi, Kevin Butcher, Sergio Medrano, Kirk Maxwell, Sean Doolan, Sean Monahan, John Canty, Christian Cuascut Hernandez, Rick Johnson, and Timothy Cullen were BPD officers who, at all relevant times, were acting under color of law and within the course and scope of their duties as BPD officers and employees of the City of Boston.  All Defendant BPD officers are sued in their individual capacities.

## FACTUAL ALLEGATIONS

### Background:  A Legacy of Unconstitutional and Racially Disparate Patfrisks

6.     The Boston Police Department has long recognized that its officers disproportionately target Black men for investigative patfrisks.  A seminal 2015 study, conducted at the request of the BPD, showed that Black citizens were substantially more likely to be frisked and searched during a police encounter–even *after* controlling for prior

criminal history, gang membership, and other factors.  Jeffrey Fagan et al., *Final Report: An Analysis of Race and Ethnicity Patterns in Boston Police Department Field Interrogation, Observation, Frisk, and/or Search Reports* 13 (2015) ("2015 Fagan Report").

7.      The 2015 Fagan Report was report was widely publicized, and its findings were well known to BPD policymaking officials.  *See, e.g.,* Evan Allen, *Boston Police to Step Up Antibias Measures; Respond to Report on Dealings with Black Residents*, Bos. Globe, July 3, 2015.

8.      The 2015 Fagan Report provided the statistical basis for the publication of a widely publicized ACLU report entitled *Black, and Targeted: A Report on Boston Police Department Street Encounters from 2007–2010* ("2015 ACLU Report").

9.      In response, BPD updated specific regulations to prevent unconstitutional patfrisks.  BPD Rule 323, Section 3.3 states, "An officer may only conduct a frisk when s/he has objective articulable facts which lead him/her to believe that the person with whom s/he is dealing may be armed, and thus poses a threat to the officer or others."  This rule mirrors Supreme Court guidance in *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968), which holds that a lawful patfrisk requires that "the police officer must be able to point to specific and articulable facts" which would lead an objective officer to believe that the suspect is "armed and presently dangerous."

10.      Likewise, BPD implemented regulations to curb unconstitutional racial profiling.  Under BPD Rule 113A, Section 4.1, police officers "shall not consider a person's race, ethnicity, sex, gender identity, sexual orientation, religion, mental or physical disability, immigration status or socioeconomic or professional level."  This rule is consistent with

1

2

Supreme Court guidance that "the Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996).

3

4

5

6

7

8

11.     Nevertheless, a 2020 statistical analysis of BPD data showed that "Field Interrogation, Observations, and Frisks" ("FIOFs") had become even *more* racially disparate. In the 2015 Fagan Report, Black residents were the subjects of 63% of FIOFs; in the 2020 analysis, that number had risen to 70%. *See* Isaiah Thompson, *Black People Made Up 70 Percent of Boston Police Stops, Department Data Show*, GBH News (June 12, 2020).

9

10

11

12

13

14

12.     In 2020, an independent commission appointed by the City concluded that BPD continued to lack adequate training, discipline, hiring, promotions, and supervision to avoid police misconduct against persons of color. *Boston Police Reform Task Force: Recommendations to the Mayor* 1-11 (September 10, 2020) ("2020 BPD Task Force Recommendations").

15

16

17

18

19

20

21

13.     During this timeframe, the D-4 precinct–where Defendant officers were posted–was a hotbed of racially disparate policing.  In 2020, nonwhite motorist stopped for a traffic infraction by D-4 officers were *three times* as likely to be searched compared to white motorists who had been stopped for a traffic violation.  2020 *Massachusetts Uniform Citation Data Analysis Report* 352 (2022).  This disparity was much higher than for the city as a whole. *Id.* at 358.

22

23

24

25

26

27

14.     Officer Paulmichael Bertocchi, who was stationed in D-4, was especially focused on nonwhite motorists.  Between 2018 and 2020, Officer Bertocchi cited 29 drivers for traffic violations.  Twenty-eight of them were nonwhite. *Traffic Citations: Motor Vehicle Citations Written by Boston Police Department Officers and Submitted to MassDOT 2011 - 2020*, https://www.wokewindows.org/citations.

28

**The stop of Mr. Platt's vehicle**

15.     In the early morning hours of June 14, 2020, Jerome Platt was celebrating his birthday with family and friends in his father's back yard.  Mr. Platt had been drinking.  A friend, Javonte Robinson, offered to drive him home.

16.     They left the party in a Mr. Platt's rented Dodge Challenger.  Mr. Platt promptly fell asleep in the passenger seat.

17.     Shortly before 2:20 a.m., BPD Officers Medrano and Maxwell observed the vehicle allegedly speeding on Tremont St. near West Dedham St. in the South End neighborhood of Boston, Massachusetts.

18.     Officers Medrano and Maxwell pursued the vehicle in their police cruiser. Upon noticing the cruiser, Mr. Robinson promptly stopped the car near the intersection of Tremont St. and Massachusetts Ave. in Boston.

19.     Shortly after the vehicle had stopped, Officers Bertocchi and Butcher arrived on the scene in an unmarked cruiser.

20.     Five other BPD officers subsequently arrived on the scene: Officers Doolan, Monahan, Canty, and Cuascut Hernandez, and Sergeant Johnson.

**Initial police inquiry, accusations, and demands**

21.     Officers Medrano and Butcher approached the driver's side of the vehicle and asked Mr. Robinson for his driver's license.  Mr. Robinson replied that he did not have a driver's license.  Mr. Robinson was subsequently ordered to exit the vehicle.  He was placed under arrest and patfrisked.

22.     At roughly the same time that Officers Medrano and Butcher approached the driver's side, Officers Bertocchi and Maxwell approached the passenger side of the vehicle.

23.     Officer Bertocchi immediately accused Mr. Platt of violating the Massachusetts safety belt statute (M.G.L. c. 90, § 13A).

24.     Based on this alleged civil offense, Officer Bertocchi demanded Mr. Platt's identification and began to interrogate him.

25.     Bodyworn camera ("BWC") footage[1] of the incident shows that while Mr. Platt was being questioned, *he was calm and nearly motionless*.  Mr. Platt's hands are visible at all times while holding a cellphone in his lap.  His body is almost completely still.  *See* BWC footage 2:29:10-2:30:00.[2]

26.     In fact, BPD Officer Sean Doolan, who witnessed Mr. Platt's demeanor during the incident, complimented him as "cool and cooperative."  BWC footage 2:34:56 a.m.

27.     Mr. Platt was exceptionally careful not to move because he did not want to get shot.  This incident occurred three weeks after the murder of George Floyd, and Mr. Platt was conscious that any sudden or unexpected movements could be misinterpreted by police and result in escalation of the incident.

28.     At one point, while being badgered by Officer Bertocchi for his dirver's license, Mr. Platt realized that the license was located in a pocket on the driver's side door.  Nonetheless, Mr. Platt declined to reach across the front seat and retrieve it for fear he would be shot.

### Exit order and patfrisk

29.     Despite Mr. Platt's motionlessness, Officers Bertocchi and Maxwell ordered Mr. Platt to exit the vehicle.  He complied immediately.

---

[1] Officers Doolan and Monahan activated their BWC and captured video of this incident.  Neither Officer Bertocchi nor any of the other five officers on the scene turned on their BWC during the interrogation, exit order, and patfrisk.  Those officers were in direct violation of BPD rules.  *See* BPD Rule 405, Section 2.2.
[2] BWC citations refer to synchronized and calibrated timestamps, converted to Eastern Daylight Time.

30.     At no time did Mr. Platt give police officers consent to search his person.

31.     When Mr. Platt exited the vehicle, Officer Bertocchi immediately patfrisked him.  Less than two seconds transpired between Mr. Platt stepping onto the street and Officer Bertocchi handling his body.  BWC footage 2:30:01-2:30:03 a.m.

32.     According to the police report, Officer Bertocchi's stated reason for patfrisking Mr. Platt "to ensure there was no weapons present [sic]," indicating that he was performing a protective frisk under the authority of *Terry v. Ohio*.

33.     Under *Terry*, a lawful patfrisk requires "specific and articulable facts" which would lead an objective officer to believe that the suspect is "armed and presently dangerous."  Terry, 392 U.S. at 21, 30.

34.     Nonetheless, the police report, written that same day by Officer Bertocchi, does not indicate that *any* of the following articulable facts prompted the patfrisk:

  a.  furtive, suspicious, or aggressive movements;

  b.  inability to see Mr. Platt's hands;

  c.  hostile or threatening words;

  d.  bulges in Mr. Platt's clothing;

  e.  visual observation of any weapons–or any items that could conceivably be confused for weapons;

  f.  any weapons found during the patfrisk of Mr. Robinson;

  g.  reports of nearby violent incidents;

  h.  suspicion that Mr. Robinson and/or Mr. Platt had been involved in violent criminal activity that night;

  i.  suspicion that Mr. Robinson or Mr. Platt were involved in gang activity;

  j.  informant's tips that Mr. Robinson or Mr. Platt had weapons or any other contraband.

35.     During the incident, seven BPD officers were on the scene to witness Officer Bertocchi patfrisk Mr. Platt.  None of them did anything to intervene.  BWC footage 2:30:01-2:30:30 a.m.

36.     Shortly after the patfrisk, Sergeant Rick Johnson arrived on the scene.  He did nothing to intervene or remediate the situation.  He did not discipline any of the officers involved.

37.     Likewise, Sergeant Timothy Cullen, who approved and signed the police report, did not object to the officers' actions, and he did nothing to criticize or discipline any of the officers involved.

**Fruits of the patfrisk**

38.     Police did not find any weapons on Mr. Platt's person.

39.     Officer Bertocchi allegedly found pills that he believed to be oxycodone and MDMA-Ecstasy in one of Mr. Platt's pockets.

40.     Officer Bertocchi allegedly found $1481 in another pocket.  The money was confiscated by police.

41.     According to the police report, a subsequent search of the automobile yielded additional unidentified pills in the center console.

**Legal aftermath**

42.     Mr. Platt was charged with two counts of Possession with Intent to Distribute Class B Substances (M.G.L. c. 94C, § 32A(a)).

43.     Mr. Platt was arraigned in Boston Municipal Court on November 10, 2020.

44.     During legal proceedings, Mr. Platt sought information under Mass. R. Crim. P. 14(a) to determine whether BPD officers acted with impermissible racial bias.

45.     The court agreed that Mr. Platt demonstrated sufficient legal basis to compel discovery for information on potential racial bias, including information regarding the BPD officers' prior training, citations, interrogations, and patfrisks of white and Black citizens.

46.     Despite a court order, police and prosecutors refused to turn over this discovery.

47.     The Commonwealth's brazen violation of this court order prompted the court to dismiss criminal charges against Mr. Platt on December 6, 2021.

**Impact on Mr. Platt**

48.     The patfrisk of Mr. Platt–like all patfrisks–was frightening and humiliating.  *See Terry*, 392 U.S. at 25.

49.     Moreover, the patfrisk was physically painful.  Police handcuffed Mr. Platt and forced him to stand for an extended period.  Officers then shoved him into the back of a police cruiser, where they forced him to sit in an uncomfortable position, with his arms pinned behind his back, for an extended period.

50.     Police officers confiscated nearly $1500 of Mr. Platt's money, which has never been returned.

51.     Mr. Platt was incarcerated in lieu of bail on these charges for 328 days.[3]

52.     Because the case was dismissed without prejudice, Mr. Platt was put in fear of being charged again for the same crime.  He was filled with dread, anxiety, and distress regarding potential loss of liberty and/or substantial fines.

53.     The criminal charges resulting from the patfrisk are a permanent part of Mr. Platt's criminal record, which may be viewed by prospective employers, landlords, or licensing authorities.

---

[3] Mr. Platt was held from January 12, 2021, until December 6, 2021, concurrent with his incarceration on other charges (Docket 2122CR000004).

54.     The harms suffered by Mr. Platt were the direct, foreseeable, and proximate result of the unconstitutional patfrisk.

### FIRST CAUSE OF ACTION

**42 U.S.C. § 1983 – Fourth Amendment Violation – Unreasonable Search**

**(Against Defendants Bertocchi, Butcher, Medrano, Maxwell, Doolan, Monahan, Canty, Cuascut Hernandez, Johnson, and Cullen)**

55.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

56.     The Fourth Amendment to the United States Constitution states, "The right of the people to be secure in their person, houses, papers, and effects against unreasonable searches and seizures, shall not be violated . . . ."

57.     Officer Bertocchi's patfrisk of Mr. Platt comprised a search in the constitutional sense.  *See Terry*, 392 U.S. at 12.

58.     A lawful patfrisk under these circumstances requires either (a) consent, (b) a valid search warrant, or (c) specific and articulable facts which would lead an objective officer to believe that the suspect is armed and presently dangerous.[4]  *See Terry*, 392 U.S. at 21, 30.

59.     The patfrisk of Mr. Platt satisfied none of these criteria.

60.     Consequently, the search violated Mr. Platt's Fourth Amendment rights.

61.     BPD officers on the scene who did not physically touch Mr. Platt nevertheless conspired with, verbally encouraged, and/or aided and abetted the patfrisk.  In addition, all officers who witnessed the patfrisk were in a position to stop it–yet failed to do so.

62.     Sergeant Rick Johnson, a supervising authority, did not intervene or remediate the situation.  He thereby aided and abetted the constitutional violation.

63.     Sergeant Timothy Cullen, a supervising authority, approved the written report of the incident and did not discipline any of the officers involved.  He thereby aided and abetted the constitutional violation.

64.     At the time of the search, all individual Defendants knew–or in the exercise of reasonable care should have known–that the patfrisk violated Mr. Platt's clearly established constitutional rights under the Fourth Amendment.  *Terry*, 392 U.S. at 21; BPD Rule 323, Section 3.3.  Officers were "on notice [that] their conduct [was] unlawful.  *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

65.     All individual Defendants therefore lack immunity from suits or liability.  This extends both to statutorily created immunity and to the judicially created doctrine of "qualified immunity."  *Id.*

66.     The acts and omissions of Defendant BPD officers proximately and foreseeably caused Mr. Platt's damages, injuries, and losses.

67.     In committing the acts and omissions alleged herein, Defendant BPD officers acted with reckless or callous disregard for the plaintiff's rights.

68.     Accordingly, Mr. Platt is entitled to obtain punitive damages from Defendant BPD officers in an amount sufficient to punish and deter such conduct.  *See Smith v. Wade*, 461 U.S. 30, 51 (1983).

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 – Fourteenth Amendment Violation – Equal Protection Clause

**(Against Defendants Bertocchi, Butcher, Medrano, Maxwell, Doolan, Monahan, Canty, Cuascut Hernandez, Johnson, and Cullen)**

69.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

[4] Other potential exceptions to the warrant requirement, such as search incident to arrest, are not relevant here.

70.     The Equal Protection Clause of the Fourteenth Amendment declares, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

71.     The Equal Protection Clause prohibits racially biased policing.  *See Whren*, 517 U.S. at 813.

72.     Because neither Officer Bertocchi nor any other BPD officer provided any legally cognizable, articulable facts that would justify a patfrisk, Mr. Platt reasonably infers that race was a motivating factor in the officers' actions.[5]

73.     To prove racial bias, a Plaintiff need not prove that bias was the *sole* or *primary* motivation for a police officer's actions, but merely "*a motivating factor.*"  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (emphasis added).

74.     Because police officers rarely declare their discriminatory purpose, courts demand "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Id.* at 266.  Statistical evidence is an appropriate consideration.  *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d 540, 583 (S.D.N.Y. 2013).

75.     In the instant case, the following statistical evidence indicates that discriminatory intent was a motivating factor:

   a.   the patfrisk was consistent with prior actions of the Boston Police Department, which focused its traffic stops, patfrisks, and investigations on Black citizens;

   b.   the patfrisk was especially consistent with prior actions BPD District D-4 officers, who disproportionately focused their traffic stops, patfrisks, and investigations on Black citizens;

   c.   the incident was consistent with prior actions of Officer Bertocchi, who focused his traffic stops on nonwhite citizens.

---

[5] Mr. Platt alleges that the patfrisk was racially motivated, but he does not claim that the initial traffic stop for speeding was racially motivated.

76.    Moreover, the fact that police and prosecutors in Mr. Platt's criminal case refused to provide discovery regarding potential racial bias–*despite a valid court order*–demonstrates consciousness of liability.

77.    BPD officers on the scene who did not physically touch Mr. Platt nevertheless conspired with, verbally encouraged, and/or aided and abetted the patfrisk.  In addition, all officers who witnessed the patfrisk were in a position to stop it–yet failed to do so.

78.    Sergeant Rick Johnson, a supervising authority, did not intervene or remediate the situation.  He thereby aided and abetted the constitutional violation.

79.    Sergeant Timothy Cullen, a supervising authority, approved the written report of the incident and did not discipline any of the officers involved.  He thereby aided and abetted the constitutional violation.

80.    At the time of the search, all individual Defendants knew–or in the exercise of reasonable care should have known–that the patfrisk violated Mr. Platt's clearly established constitutional rights under the Fourteenth Amendment.  *Whren*, 517 U.S. at 813; BPD Rule 113A, Section 4.1.  Officers were "on notice [that] their conduct [was] unlawful.  *See Hope*, 536 U.S. at 739.

81.    All individual Defendants therefore lack immunity from suits or liability.  This extends both to statutorily created immunity and to the judicially created doctrine of "qualified immunity." *Id.*

82.    The acts and omissions of Defendant BPD officers proximately and foreseeably caused Mr. Platt's damages, injuries, and losses.

83.    In committing the acts and omissions alleged herein, Defendant BPD officers acted with reckless or callous disregard for the plaintiff's rights.

84.     Accordingly, Mr. Platt is entitled to obtain punitive damages from Defendant BPD officers in an amount sufficient to punish and deter such conduct.  *See Smith*, 461 U.S. at 51.

### THIRD CAUSE OF ACTION

### *Monell* Claim – Municipal Liability – Custom or Usage

### (Against Defendant City of Boston)

85.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

86.     Section § 1983 provides for municipal liability when city employees engage in a pattern of unconstitutional activity that represents a "custom or usage"–regardless of whether the municipality formally approved such conduct.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691-93 (1978).

87.     To prove such a claim, the Plaintiff must show that policymaking officials of the municipality had "actual or constructive knowledge" of the practice, and that they failed to eradicate it.  *See Bordanaro v. McLeod*, 871 F.2d 1151, 1156-57 (1st Cir. 1989) ("failure to eradicate this facially unconstitutional practice from the police department attributes that custom to the municipality").

88.     In the instant case, BPD had actual and constructive knowledge.  The 2015 Fagan Report, which was commissioned by the BPD and widely publicized, showed vast racial disparities in FIOF activity.  Moreover, the report found "an *institutional dimension* to explain officer FIO[F] activity that is separate from an individual officer's taste or preference for discrimination."  2015 Fagan Report 17 (emphasis added).

89.     The City manifestly failed to end the practice of racially disparate FIOFs and patfrisks.  Racial disparities actually *increased* in subsequent years.  *See* Isaiah Thompson,

*Black People Made Up 70 Percent of Boston Police Stops, Department Data Show*, GBH News (June 12, 2020).  In fact, in 2020 the City conceded that Black citizens continued to be "disproportionately impacted by excessive use of FIO[F]s," and that "BPD's current bias free policy (Rule 113A) is deficient."  2020 BPD Task Force Recommendations 6, 10.

90.     Moreover, additional support for the existence of a "custom or usage" can be inferred from the event itself.  *See Bordanaro*, 871 F.2d at 1156.  Here, the incident involved the joint actions of at least ten BPD officers. A reasonable inference to draw from this is that the officers involved were operating under a shared set of rules and customs.  *See id*.

91.     The unconstitutional "custom or usage" of the City of Boston was the moving force in causing the injuries and damages suffered by Mr. Platt in the incident alleged herein.

## FOURTH CAUSE OF ACTION

### *Monell* Claim – Municipal Liability – Failure to Train, Supervise, and Discipline
### (Against Defendant City of Boston)

92.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

93.     Section § 1983 provides for municipal liability when a city fails to adequately train, supervise, or discipline its police force to avoid unconstitutional actions, and where such failures amount to deliberate indifference. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *Floyd*, 959 F.Supp. 2d at 658-69, 665.

94.     Here, policymaking officials had actual and constructive notice regarding inadequate training, supervision, and discipline regarding patfrisks and racial profiling.  *See* 2015 ACLU Report 2, 6, 14, 15, 16, 17.

95.     Despite notice, policymaking officials did not resolve these deficiencies.  In 2020, the City conceded that its training, supervision, and discipline remained woefully inadequate.  *See* 2020 BPD Task Force Recommendations 1, 8, 10, 23, 24.

96.     The City's manifest failure to effectively address these deficiencies between 2015 and 2020 constitutes evidence of deliberate indifference.

97.     Moreover, additional support for the existence of inadequate training, supervision, and discipline can be inferred from the event itself.  *See Bordanaro*, 871 F.2d at 1161.  Here, none of the BPD officers, including supervisors, seemed to realize that the patfrisk of Mr. Platt was unconstitutional, nor took any actions to supervise or discipline any of the officers involved.  It is reasonable to infer from what happened that these police officers received similar training and supervision and had similar understandings about whether they would be subject to discipline for their actions. *See id.*

98.     In addition, the fact that prosecutors in Mr. Platt's criminal case refused to provide discovery regarding the BPD officers' training–*despite a valid court order*–demonstrates consciousness of liability.

99.     Lack of adequate training, supervision, and discipline was a moving force in causing the injuries and damages suffered by Mr. Platt.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for a judgment against Defendants as follows:

(1)     For general and special compensatory damages (including direct, indirect, and emotional damages), presumed damages, and nominal damages, against all Defendants, in an amount to be determined by the trier of fact.

(2)    For punitive damages against all Defendant BPD officers, in an amount to be

determined by the trier of fact.

(3)    For reasonable attorney's fees and costs and expenses of litigation, pursuant to

42 U.S.C §§1983-1988, and any and all other relevant statutory or case law.

(4)    For any and all other relief, including interest and/or injunctive relief, to which

Plaintiffs may be entitled under law or equity and which this Court may determine is

appropriate under the facts of this case.

## DEMAND FOR JURY TRIAL

Plaintiff hereby respectfully requests a jury trial on each and every cause of action set forth

in this Complaint.

Respectfully submitted,

JEROME I. PLATT
By his attorney:

*/s/ Robert F. Cunha*

Robert F. Cunha, BBO #710882
Massachusetts Defender LLC
90 Canal Street, 4th Floor
Boston, MA 02114
Phone: (617) 528-9855
bob@massdefender.com

Date: June 8, 2023